# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. DKC-16-265 |
| | * | |
| MENACHEM SHOHAM, | * | |
| | * | |
| Defendant | * | |

\*\*\*\*\*\*

## GOVERNMENT'S REPLY MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through the undersigned attorneys, hereby submits this Reply Memorandum in Aid of Sentencing for the defendant Menachem Shoham's sentencing. In his sentencing memorandum, the defendant has attempted to direct the Court's focus away from his own criminal conduct and onto the acts and omissions of his co-conspirators. The government submits this memorandum to refocus attention to the defendant's conduct.

**I.    The Defendant has not taken Full Responsibility for His Actions**

While the defendant's sentencing memorandum repeatedly states that the defendant has accepted responsibility for his crime, those statements cannot be squared with the arguments presented in the sentencing memorandum. First, the defendant goes to great lengths to minimize his culpability by blaming others. For example, the defendant attempts to spin his acts of tax evasion as "directed or suggested by Martin Lack." Defendant's Sentencing Memorandum ("Def. Sent. Memo.,") p.10 n.4 [D.E. 24]. The defendant never operated under the misapprehension that the actions he took at Lack's suggestion were measures taken to further a lawful pursuit. Indeed, when the defendant agreed to limit his use of credit cards to outside the United States, when he moved his account from UBS to another Swiss bank, and when he met with Martin Lack in hotel rooms in Florida and accepted envelopes stuffed with cash as

withdrawals from his account, there was an explicit understanding that the Defendant took those actions to conceal his offshore assets from the IRS and to further an existing crime.[1]

Second, the defendant further attempted to deflect responsibility by claiming that his co-conspirators, particularly Co-Conspirator 2, his mother, and Co-Conspirator 4, a retired IRS Special Agent, are more culpable than he is. Def. Sent. Memo, pp. 12-13. While it is true that those individuals engaged in the same criminal conduct – as is oft true in any conspiracy, there is one material difference between the Defendant and Co-Conspirators 2 and 4: the Defendant took on the leadership role in the scheme.[2] The Defendant acted as the family's point person for communication with Martin Lack. That is, the Defendant initiated contact with Lack, coordinated meetings, made travel arrangements for the family members, and arranged withdrawals. In meetings with Lack, the Defendant gave general investment direction regarding the family members' respective accounts. In between meetings, the Defendant contacted Lack every two or three months to obtain the values of all three accounts. Further, within his own family, the Defendant directed his spouse to provide false information to their return preparer despite his spouse's repeated requests to truthfully respond to direct questions regarding whether they owned and controlled foreign financial accounts.

## II.  The Defendant is not Similarly Situated to Those Who Entered the OVD

The Defendant argues that his "conduct does not merit significant punishment" on the grounds that "there is little that differentiates his case" from the thousands of taxpayers with undeclared foreign financial accounts who the IRS permitted to escape criminal prosecution by

---

[1] The Defendant also followed Lack's advice to cease receiving his account balances by email and to obtain them, instead, by fax. Presumably, the Defendant followed the advice to ensure that no evidence of hi undeclared foreign financial accounts did not appear on his home computer.

[2] Both Lack and the Defendant's family members characterized the Defendant's role in similar terms.

entering the Offshore Voluntary Disclosure Program.  See Def. Sent. Mem. pp. 27-28.  The government disagrees.  The IRS 's OVD program required taxpayers to:  come forward at their own volition, and admit their guilt; pay taxes, penalties and interest on unreported income; pay a penalty on the balance in the undeclared accounts; and cooperate with the IRS and law enforcement.  The defendant did none of this voluntarily and – for that reason – he deserves just punishment.

The Defendant is not similarly situated to the taxpayers who entered the IRS's OVD program as he never voluntarily disclosed his undeclared accounts.  Indeed, he had numerous opportunities to do so and each time rejected the option of disclosure.  In 2003, the Defendant and his co-conspirators me with Lack at a hotel in Miami.  At that meeting, Lack warned the Shoham family members that the IRS could discover their undeclared accounts at UBS.  Lack recommended that they clos their accounts at UBS and move their assets to accounts at another Swiss bank in order to better conceal them from the IRS.  Co-Conspirator 4, a retired IRS Special Agent, spoke up and recommended that the co-conspirators close their undeclared Swiss accounts and repatriate the funds.  The Defendant and Co-Conspirator 2 overruled Co-Conspirator 4.  From 2004 to 2009, Co-Conspirator 4 repeatedly raised the possibility of closing the accounts and repatriating the funds.  Each time the defendant and Co-Conspirator 2 refused to entertain such an option.  While the Defendant contends that Co-Conspirator 4, a retired IRS Special Agent, was more culpable in maintaining an undeclared account, it should be noted that the Defendant ignored the advice of an IRS Special Agent who certainly knew the consequences of flouting the internal revenue laws.

In 2009, UBS AG entered into a Deferred Prosecution Agreement with the Department of Justice related to the offshore evasion scheme perpetrated by the bank.  Months later, the

Defendant received a letter from UBS that put him on notice that his account could be disclosed to the IRS. At that point, the Defendant was eligible to enter the IRS's OVD program. The Defendant discussed the matter with Lack and Co-Conspirator 4, each of whom advised him to enter the OVD. Indeed, Lack advised the Defendant that he had no choice but to disclose the account to the IRS. But the Defendant thought that the chance of criminal prosecution was quite low given that he had an account valued at less than $1 million. The Defendant engaged in a cost benefit analysis, estimated that it would cost a significant amount to complete the OVD program, and elected not to enter the OVD program.[3]

The defendant's post-2009 conduct betrayed a cavalier indifference to the consequences of the willful failure to report his foreign financial accounts and the income derived therefrom was the product of his assessment that there was little chance that he would face criminal sanction. Although Defendant was on notice that he could be prosecuted for failure to disclose his undeclared account, he twice traveled to Switzerland to obtain cash from his Swiss account, once in April 2010, and again in October 2011.[4] It should be of great import that the defendant's last trip to Switzerland to withdraw funds occurred two years after he learned of the OVD and three months <u>after</u> a grand jury returned an indictment charging Martin Lack, his former banker, for conspiring to defraud the United States.[5] See <u>United States v. Lack</u>, 11-cr-60184-WPD (S.D.

---

[3] The Defendant has denied that he made such statements to Lack.

[4] The Defendant and Co-Conspirator 1 both stated that the defendant used a significant portion of the cash that he withdrew from the foreign financial accounts to make charitable contributions. The government was unable to corroborate such payments as the Defendant professed that he had no receipts and could not identify a single individual or group who received the contributions. Further, Co-Conspirator 1 advised the government that she had no first-hand knowledge of the Defendant making such donations. Rather, she stated that the Defendant informed her that he made such contributions upon his return from his foreign travels.

[5] Lack cancelled his asset management contract with the co-conspirators in or about 2010 when he ceased managing undeclared accounts for U.S. persons. Lack transferred management of undeclared accounts owned by U.S. persons, including the Shoham family accounts, to another Swiss asset manager. Prior to terminating his relationship with
(continued...)

Fl. Aug. 2, 2011). Indeed, had the defendant entered the OVD in 2009, it is entirely likely he would have been asked to cooperate against Lack, like Lack's other clients who received cash from him in the United States and who appear as Customers 1, 2 and 3 in the Lack indictment.[6]

### III. SENTENCES IN OTHER OFFSHORE MATTERS

The defendant has argued that a sentence of probation is appropriate because other taxpayers who committed tax crimes involving undeclared foreign financial accounts received non-incarceratory sentences. The cases cited by defendant involved facts substantially different from those presented here, either in regard to the crime committed or to the cooperation provided, that they do not support defendant's argument.

For example, defendant cited United States v. Stedman, No. 0:14-cr-60073-WPD (S.D, Fla. Jan. 14, 2015), as an example. While the defendant accurately recites the criminal conduct of the defendant, the defendant effectively ignores the factors that the government cited as grounds for a downward variance and downward departure. While the government agreed that a downward variance was appropriate as the defendant – aged 84 – was elderly and had debilitating infirmities, the defendant's "superlative" cooperation was the basis of the government's recommendation for a downward departure.[17] [D.E. 26, p. 4] The government

---

(… continued)
the Shohams, Lack had advised the Defendant (and possibly the other co-conspirators) that he was in trouble and the United States government was after him.

[6] In contrast to the defendant's claim, he provided no cooperation to the government. See Def. Sent Memo., p. 13 ("It is also important to consider that Mr. Shoham, in further demonstrating his acceptance of responsibility for his wrongful conduct, has cooperated with the government in this case.") Here, the sum and substance of defendant's "cooperation" is his agreement to plead guilty and submission to a proffer. The Court should be well aware that such conduct is not the extraordinary cooperation that would merit the filing of a motion for downward departure. The defendant has received what he deserves for that routine conduct – a reduction in offense level for acceptance of responsibility and a government sentencing recommendation at the low end of the Guidelines.

[17] Stedman also had a tax loss less than that of the defendant.

5

advised the Court that Stedman had been a government witness at the trial of Raoul Wiel, a former UBS AG executive, and also provided actionable information regarding other taxpayers who committed tax fraud. Id. In no way could the recommendation of probation be misconstrued as evidence that the government views tax offenses as not "particularly serious or meriting incarceration" as defendant contends. See Def. Sent. Memo., p. 22.

United States v. Briguet also is illustrative. Briguet was a Swiss national who opened his Swiss account before emigrating from Switzerland. He deposited funds with the intention of using the assets for his retirement in his home country. Briguet never had a credit card to access his offshore funds nor did he take withdrawals from his account, as opposed to the defendant who received cash-filled envelopes here in the United States. None of the facts that support imposition of a term of imprisonment in this case are found there.[18]

The defendant's conduct also can be distinguished from that of Ty Warner, the Beanie Baby entrepreneur, in United States v. Warner. In Warner, the defendant squirreled away approximately $100 million as, in essence, "rainy day" money. Warner never made any withdrawals from the account. In 2009, Warner became aware of the OVD program, retained counsel, and attempted to enter the program. While the IRS rejected the application, Warner, unlike the Defendant voluntarily attempted to enter the program and come into compliance. Ultimately the Court imposed a sentence of probation over the government's strenuous objection.

Contrary to the impression one would receive from the Defendant's sentencing memorandum, taxpayers with undeclared foreign financial accounts have been sentenced to

---

[18] Although the Government requested that the Court impose a term of imprisonment of 18 to 24 months, the Court granted a downward variance over the Government's objection.

prison for their crimes.[19] For example, taxpayers with undeclared foreign financial accounts have received incarceratory sentences in the following matters:

- United States v. Berg, 5:12-cr-00877 (N.D. Cal.): Taxpayer who deposited $642,070 in compensation in his UBS account held in the name of an offshore entity and withdrew funds in cash and used a credit card linked to his account sentenced to a year and a day in prison.

- United States v. Michael Canale, 1:12-cr-00975 (S.D.N.Y.): Retired Army surgeon ordered by father never to disclose foreign financial accounts held the name of offshore entities sentenced to 6 months' imprisonment.[20]

- United States v. Mitchem, 1:14-cr-00035 (W.D.N.C.): Former UBS account holder guilty of tax evasion who concealed over $4 million of funds from his own account and an account he inherited from his parents and later provided false information to the IRS sentenced to 9 months imprisonment and 3 months home confinement.

- United States v. Roberts, 1:11-cr-00199 (E.D. Cal.) : Husband and wife who failed to report any income earned on multiple foreign financial accounts and falsely deducted on their corporate tax returns millions of dollars in transfers from their domestic business to their Swiss bank accounts sentenced to 12 months and a day in prison.

---

[19] For example, the Defendant cited United States v. Schober as an example where of a prosecution involving an undeclared foreign financial account where the defendant "received a significant variance sentence, like the other defendants." Def. Sent. Memo., pp. 23-24. The defendant received a sentence of one-months' incarceration and two-months home detention.

[20] Peter Canale, Michael's brother, was sentenced for a similar crime by a different judge in the Southern District of New York and received a probationary sentence. See United States v. Canale, 1:14-cr-00713 *S.D.N.Y.).

7

- United States v. Troost, 13-cr-185 (N.D. Ill.): Businessman guilty of tax evasion who concealed millions in assets and income exceeding $1 million in multiple accounts at UBS sentenced to a year and a day in prison.
- United States v. Werdiger, 1:10-cr-00325 (S.D.N.Y.): A diamond merchant who utilized undeclared accounts held in the names of sham entities at UBS and to hide more than $7.1 million in assets from U.S. received a sentence of a year and a day in prison.

**IV.     Imposition of a Fine is Appropriate and Just**

The defendant has requested that the Court forgo a fine as he will pay in excess of $342,000 in the form of unpaid taxes and an FBAR penalty. First, the defendant has not been excessively penalized for failure to report his foreign financial accounts. Under the Bank Secrecy Act, the IRS could have assessed a penalty of 50% of the high balance in the account <u>for each year</u> that the defendant failed to report the account. See 31 U.S.C. §§ 5321(a)(5)(C). As such, the defendant could have been subject to penalties that vastly exceeded the value of his account.[21]

Second, as set forth in the Presentence Investigation Report, the Defendant possess substantial wealth and, with his spouse, receives prodigious income each month. Indeed, extrapolating from the monthly income figure in the report, the Defendant expects to earn $458,520 in the next 12 months. Even if the Defendant were to pay the fine requested by the Government ($30,000) in addition to the agreed-upon FBAR penalty ($306,000) and restitution

---

[21] The Defendant could have been subject to a vastly lower penalty had he entered the OVD. The 2009 OVD program imposed a penalty equal to 20% of the high balance of the account. The 2011 OVD, which began on February 8, 2011 and closed on September 9, 2011, imposed a penalty equal to 25% of the high balance of the account.

($36,287), the Defendant would have pre-tax income of $86,233 over those 12 months. Given the Defendant's resources and the nature and length of his crime, it is just to impose a fine at the high end of the range.

In the end, the Defendant is entitled to an individualized assessment of the facts and circumstances of his crime. Here, the facts – including the prolonged nature of the crimes, the Defendant's leadership role, the Defendant's persistence in engaging in criminal conduct despite repeated admonitions to make a clean breast – warrant a sentence that includes a term of incarceration within the advisory Guidelines range.

**III. CONCLUSION**

For all the reasons set forth above, the United States respectfully requests that the Court sentence the defendant to a within-guidelines sentence of 12 months incarceration and a fine and order the defendant to pay restitution in the amount of $36,287.

        Respectfully submitted,

        Rod J. Rosenstein
        United States Attorney

By: _____/s/ Mark F. Daly _____
        Mark F. Daly
        Senior Litigation Counsel
        Robert J. Boudreau
        Trial Attorney
        U.S. Department of Justice, Tax Division

        David I. Salem
        Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2016, I caused the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

By: _____/s/ Mark F. Daly_____
Mark F. Daly
Senior Litigation Counsel
U.S. Department of Justice, Tax Division